IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICH AUREL, #317239                     *

Plaintiff,                              *

        v.                          *   Civil Action No. ELH-15-1920

LT. EDWARD TWIGG                        *

Defendant.                              *
                                        *****

## MEMORANDUM

On June 29, 2015, plaintiff Mich Aurel, a self-represented inmate incarcerated within the Maryland Division of Correction ("DOC"), filed a civil rights action pursuant to 42 U.S.C. § 1983, seeking money damages from Lieutenant Edward Twigg, the Maintenance Supervisor at North Branch Correctional Institution ("NBCI").[1]  Defendant has filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment  (ECF 11), as well as a legal memorandum (ECF 11-1) (collectively, "Motion") and numerous exhibits consisting of hundreds of pages.[2]

Pursuant to the dictates of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), on October 27, 2015, the Clerk of Court informed Aurel that defendant had filed a dispositive motion; that Aurel had seventeen days in which to file written opposition to the motion; and that if Aurel failed to respond, the claim against defendant could be dismissed without further notice.

---

[1] In his Complaint, plaintiff refers to himself as Aurel Mich.  ECF 1 at 1.  The Maryland Department of Public Safety and Correctional Services lists plaintiff as Mich Aurel on its "inmate locator" website, and all exhibits provided to the court likewise list him as Mich Aurel. Therefore, I will refer to him per the DPSCS designation of Mich Aurel.

[2] All exhibits are referenced by their electronic filing number.  As noted, some of the exhibits are quite lengthy.  To illustrate, ECF 11-3 consists of 44 pages; ECF 11-4 is 21 pages in length; and ECF 11-5 exceeds 230 pages.

ECF 12.  Nevertheless, Aurel has not filed a response.

The matter is ready for disposition, and no hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2014).  For reasons that follow, defendant's Motion (ECF 11), construed as a motion for summary judgment, will be GRANTED.

## I. Background

Aurel is a frequent litigator in this Court.  In this case, Aurel alleges that the lack of ventilation in Housing Unit #2 at NBCI is life threatening due to hot temperatures and his respiratory conditions, *i.e.* asthma and bronchitis.  He claims that Twigg keeps the ventilation off in the housing unit.  ECF 1 at 3.  Therefore, he challenges the conditions of confinement, presumably under the Eighth Amendment to the Constitution.

Defendant Twigg has submitted an uncontested Declaration.  ECF 11-2.  He avers that, since 2000, he has worked for the Maryland Department of Public Safety and Correctional Services ("DPSCS").  He now holds the position of Correctional Maintenance Officer Manager in Cumberland, Maryland  *Id.* ¶ 2.

In his Declaration, Twigg avers that each of the housing units at NBCI has a ventilation system that brings in outside air and that each individual cell has an exhaust vent.  ECF 11-2, Twigg Decl., ¶ 4.  Twigg maintains that ventilation guidelines established by the American Correctional Association are adhered to by DPSCS and personnel at Housing Unit #2, where plaintiff lived (ECF 1 at 3).  ECF 11-2, ¶ 5.  In addition, the DPSCS has a preventive maintenance program that involves testing every four months to ensure that the ventilation system is functioning properly.  *Id.* ¶ 6.  Twigg affirms that there have been no "significant ventilation issues reported outside normal common repairs."  *Id.* ¶ 7.

Defendant's submissions show that Aurel was seen by the medical department on January 23, 2014, for his request to obtain orthopedic shoes and a fan. ECF 11-3 at 7.[3]  When seen in the Chronic Care Clinic ("CCC") on January 28, 2014, Aurel was told that a fan was not permitted in his housing unit because of security concerns. ECF 11-3 at 9.  On February 6, 2014, Aurel was seen in his cell by the medical department for his complaint of shortness of breath.  At the time, Aurell was "laying flat on his back on his cell floor gasping for air," although it was February, not the summer.  ECF 11-3 at 12.  Autumn Durst, R.N., observed that Aurel would not answer her questions or make eye contact.  His oxygen saturation levels and vital signs were found to be within normal limits.  *Id*. at 12-13.

Later that same morning, Aurel had an unscheduled medical examination conducted by Ava Joubert, M.D.  *Id.* at 15.  He complained that his lung problems were returning as a result of very dry air in the cell, and indicated that although he had tried to cover the vent in his cell with a blanket, his cell mate did not want the vent covered.  Dr. Joubert noted that Aurel was in no apparent distress.  *Id*. at 15-16.

In April of 2014, Aurel was seen in the medical department for his complaints that the ventilation was making his throat hoarse.  The examination found his throat to be normal.  *Id*. at 17.

On July 18, 2014, Aurel was seen in the CCC for a sick-call visit.  ECF 11-4 at 4.  Nurse Practitioner Clark noted that Aurel has had "mild persistent" asthma dating back to November of 2013 and that he experienced relief with an inhaler.  Aurel's respirations were found to be

---

[3] This suit does not contain a claim for inadequate medical care.  However, Aurel's medical condition is relevant to his claim.

The court observes that defendant has inadvertently provided a copy of a medical record from another inmate, at ECF 11-5 at 133.  The Clerk shall seal this page.

regular and he had no chest pain or audible wheezing.  *Id*.  Aurel was, however, found to be positive for heat intolerance.  *Id.* at 5.  When seen again by Clark on February 14, 2015, she noted that Aurel's sore throat symptoms were worse the previous February when he lost his portable fan. She found his throat to be normal, no coughing symptoms were observed during the visit, and Aurel was in no apparent distress.  *Id*. at 25-26.

Defendant claims that from April 28, 2015, until the filing of his complaint, Aurel was seen by the medical department at least ten times, primarily for gastrointestinal problems, and that until July 21, 2015, he denied or had no complaints of shortness of breath, wheezing, or complications with his asthma.  ECF 11-5 at 10, 25, 29, 31, 35, 41, 43, 46, 48, 50, 54 & 57.  On July 21, 2015, he was seen in the medical department, where he complained that the heat was "killing" him and his inhaler was "empty."   An Albuterol nebulizer treatment was provided. ECF 11-5 at 67.

Aurel was seen in his housing unit by Nurse Schultz on July 30, 2015, for anxiety and shortness of breath.  Shultz noted that Aurel was on the floor and, upon her arrival, he picked up his inhaler and dispensed "3 inhalations towards his mouth w/o inspiration of them."  *Id*. at 73-74.  Shultz found Aurel to be alert, oriented, with clear lungs, and heart sounds within normal limits.  She referred him to the provider for the overuse of Qvar, a daily-use inhaler to treat asthma.  *Id*.  The cell window was open.  *Id*. at 74.  The remaining portions of the medical record, including Aurel's sick-call requests, reveal no respiratory complaints, with the exception of mildly persistent asthma.  *Id*. at 115.

Russell Neverdon, Sr., the Executive Director of the Inmate Grievance Office ("IGO"), submitted a Declaration.  ECF 11-6.  He states that Aurel filed numerous grievances between

2013 and 2015, but only one complaint concerned Twigg.  *Id.* at 3.  Moreover, he did not grieve his complaints to the IGO.  *Id.*

In particular, the records show that Aurel filed several Administrative Remedy Procedure ("ARP") grievances in 2014.  In ARP-0266-14, received for filing at NBCI on January 22, 2014, Aurel complained that his cell was hot because the windows were locked.   He requested that he be provided his fan from the property room.   ECF 11-3 at 28.   The ARP was dismissed, indicating that the windows in Aurel's housing unit were closed for security and cost savings/energy waste due to the climate during the colder months in the region.  *Id*. at 28-31.

On February 4, 2014, Aurel filed ARP-0370-14, in which he complained he had been approved by the medical department to receive a number of items, including orthopedic shoes and a fan.   The ARP was preliminarily dismissed pending resubmission of supporting documentation and was finally dismissed on February 11, 2014, after Aurel failed to resubmit the requests in accordance with the coordinator's instructions.  *Id*. at 32-38.

Aurel submitted ARP-0712-14 on February 26, 2014, claiming that his cell was too hot as the windows were locked and he needed the fan from the property room.   The ARP was dismissed as repetitive.  *Id*. at 39.

On June 11, 2014, NBCI received ARP-1735-14 from Aurel, who complained that the ventilation in his cell in Housing Unit #2 was off and it was hot.   The ARP was dismissed because Aurel had exceeded the limit of ARP requests approved by the Commissioner.  *Id*. at 42-44.

## II. Standard of Review

Defendant's Motion is styled as a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) or, in the Alternative, for Summary Judgment under Fed. R. Civ. P. 56.   A motion styled in this

manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[4]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the

---

[4] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f))  To justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to the [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 Fed. Appx. 274 (4th Cir. 2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit…is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

Aurel has not filed an Affidavit under Rule 56(d).  Nor has he suggested that additional discovery is necessary.  The court is more than satisfied that, given the volume of exhibits presented here, it has ample information with which  to address the Motion as one for summary judgment, because this will facilitate resolution of the case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some*

alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).  In analyzing a summary judgment motion, the court should "view the evidence in the light most favorable to…the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

 "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). But, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black &. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45.

In the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at

247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id*. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id*. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

Because Aurel is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### III. Discussion

### A.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991)).

An inmate may state an Eighth Amendment claim based on the conditions under which he is confined. "The Supreme Court has long recognized that a prisoner may have a state-created liberty interest in certain prison confinement conditions…." *Prieto v. Clarke*, 780 F.3d

245, 248 (4th Cir. 2015). Indeed, the Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement." *Makdessi v. Fields,* 289 F.3d 126, 132 (4th Cir. 2015) (citing *Farmer v. Brennan*, 511 U.S. at 832).

Conditions that "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981). However, conditions that are merely restrictive, or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Id*. As the *Farmer* Court said, 511 U.S. at 832, "[t]he Constitution does not mandate comfortable prisons. . . ."

To establish a claim for cruel and unusual punishment due to conditions of confinement**,** a plaintiff must show (1) an objectively serious deprivation of a basic human need causing serious physical or emotional injury, and (2) that prison officials were deliberately indifferent to that need. *Farmer,* 511 U.S. at 834; *Wilson,* 501 U.S. at 298.

The Fourth Circuit has said:

> In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements - that "the deprivation of [a] basic human need was *objectively* 'sufficiently serious,' and that '*subjectively* the officials act[ed] with a sufficiently culpable state of mind.'"

*Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original; citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (*citing Wilson*, 501 U.S. at 298-300).

To meet the first prong, a plaintiff must allege facts to show that the condition complained of caused a "sufficiently serious" deprivation of a basic human need. *Farmer,* 511 U.S. at 834. "Only extreme deprivations are adequate to satisfy the objective component of an

Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, *supra*, 330 F.3d at 634.  And, the plaintiff has the burden of alleging facts sufficient to show that the risk from the conditions of his confinement was so grave that it violated contemporary notions of decency and resulted in significant physical or emotional injury. *See Hudson v. McMillian,* 503 U.S. 1, 8 (1992).

A plaintiff cannot have been found to be subjected to unconstitutional confinement conditions unless he can show a serious or significant physical or mental injury as a result of those conditions**.** *Strickler v. Waters,* 989 F.2d 1375, 1379–81 (4th Cir. 1993) (stating that the inmate's legal complaint about overcrowding and poor ventilation did not constitute a constitutional violation because inmate did not allege that he suffered any specific injury as a result of those purported conditions).  Therefore, "to withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler*, 989 F.2d 1375, 1381 (4th Cir.1993); *see Odom v. South Carolina Dept. of Corrections*, 349 F. 3d 765, 770 (4th Cir. 2003).

To meet the second prong, *i.e.*, a "sufficiently culpable state of mind," *Wilson*, 501 U.S. at 298, a plaintiff must allege facts sufficient to show that the defendant knew of circumstances from which an inference could be drawn that a "substantial risk of serious harm" was posed to plaintiff's health and safety, that he drew that inference, and disregarded the risk posed. *Farmer,* 511 U.S. at 837; *Wilson*, 501 U.S. at 298.  In other words, "'the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so.'" *Brown v. North Carolina Dept. of Corrections,* 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).

The key in determining whether prison conditions become cruel and unusual requires examination of the effect on the inmate.   *See Rhodes v. Chapman*, 452 U.S. at 364.   Such deprivations may be demonstrated by producing evidence of a serious or significant physical injury resulting from the challenged conditions, *Strickler*, 989 F. 2d at 1380-81; *Rish v. Johnson*, 131 F.3d 1092, 1096 (4th Cir. 1997), or by demonstrating a substantial risk of serious harm resulting from the unwilling exposure to the challenged conditions.  *See Helling v. McKinney*, 509 U.S. 25, 33-35 (1993) (exposure to environmental tobacco smoke).

In *Brice v. Virginia Beach Corr. Ctr.*, 58 F. 3d 101, 105 (4th Cir. 1995), the Court said that "deliberate indifference in this context lies somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in criminal law."   However, "a prison official cannot hide behind an excuse that he was unaware of a risk, no matter how obvious."  *Id.*  And, "even a subjective standard may be proven with circumstantial evidence[.]"  *Makdessi,* 789 F.3d at 133.

**B.**

In his Motion, defendant raises several defenses.  I shall address each, in turn.

**1.**

Defendant asserts entitlement to qualified immunity, arguing that his conduct did not violate any clearly established constitutional right of which a reasonable public official should have known.  *See Harlow v. Fitzgerald,* 457 U.S. 800 (1982); *see also Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

It is true that the court cannot require prison officials to possess "the legal knowledge culled 'by the collective hindsight of skilled lawyers and learned judges,' but instead only 'the

legal knowledge of an objectively reasonable official in similar circumstances at the time of the challenged conduct.'" *Johnson v. Caudill*, 475 F.3d 645, 650 (4th Cir. 2007) (quoting *Jackson v. Long*, 102 F.3d 722, 731 (4th Cir. 1996)).   The Eighth Amendment claim raised here, however, was clearly established with the issuance of the *Rhodes* decision in 1981.  Thus, defendant cannot claim qualified immunity.

## 2.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State."

Defendant contends that he is immune from suit for any claims brought against him in his official capacity.  As the Supreme Court explained in *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.,* 436 U.S. 658, 690, n. 55 (1978)) (citations omitted): "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.  Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  *See also*, *e.g.*, *Huggins v. Prince George's Cnty.*, 683 F.3d 525, 532 (4th Cir. 2012) (treating suit against individuals in official capacity as suit against County).  Thus, official capacity claims are subject to sovereign immunity under the Eleventh Amendment.  *Graham*, 473 U.S. at 167; *accord Hafer v. Melo*, 502 U.S. 21, 25 (1991).

Sovereign immunity precludes a private individual from suing an unconsenting state or an instrumentality of a state (also referred to as an "arm of the state") in federal court, absent waiver or a valid Congressional abrogation of sovereign immunity.  *See Coleman v. Court of Appeals of Maryland*, , —— U.S. ——, 132 S. Ct. 1327, 1333 (2012) ("A foundational premise of

the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Board of Trustees of Univ. of Alabama v. Garett*, 531 U.S. 356, 363 (2001); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States." (internal quotation marks and citation omitted)); *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013). Sovereign immunity accords states the dignity that is consistent with their status as sovereign entities. *Fed. Mar. Comm'n v. S. Carolina State Ports Auth.*, 535 U.S. 743, 760 (2002).[5]

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). States and their officers, sued in their official capacities, are not "persons" subject to suit for money damages under 42 U.S.C. § 1983. *Will*, 491 U.S. at 71.

Although the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code (2014 West), State Gov't. Art., § 12–201(a), it has not waived its immunity under the Eleventh Amendment to a suit of this kind in federal court.

---

[5] The Eleventh Amendment did not *create* sovereign immunity; rather, it *preserved* the sovereign immunity that the states enjoyed prior to the formation of the Union. *See Alden v. Maine*, 527 U.S. 706, 724 (1999); *see also Sossamon v. Texas*, --- U.S. ---, 131 S. Ct. 1651, 1657-58 (2011). For this reason, states enjoy sovereign immunity from private suits brought by their own citizens.

Thus, any request for monetary damages against Twigg in his official capacity is barred by Eleventh Amendment immunity.[6]

### 3.

Defendant argues that Aurel is estopped from filing this complaint inasmuch as a previous civil rights complaint, raising similar allegations, was dismissed on the merits.  *See Aurel v. Shearin, et al.*, Civil Action No. ELH-14-374 (D. Md.).

In the earlier complaint, Aurel alleged that he suffers from respiratory disorders and had been denied leave to maintain a fan in his cell.  The claims here concern Aurel's respiratory problems, but also raise a general complaint regarding the adequacy of the NBCI ventilation system.   Although this complaint is similar to Aurel's previous action, I decline to dismiss it based on principles of claim preclusion.

### 4.

Defendant asserts that Aurel's claim should be dismissed due to his failure to exhaust available administrative remedies.  The Prisoner Litigation Reform Act provides, in pertinent part:

---

[6] To be sure, the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), creates an exception to sovereign immunity that is applicable in suits for declaratory and injunctive relief against individual state officers, in order to prevent ongoing violations of federal law.  *See generally Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002); *Idaho v. Coeur d' Alene Tribe of Idaho*, 521 U.S. 261, 269 (1997); *Edelman v. Jordan*, 415 U.S. 651, 662-65 (1974) (holding that although the Eleventh Amendment permits "prospective relief," it does not permit a "monetary award"); *Equity In Athletics, Inc. v. Department of Education*, 639 F.3d 91, 107 n. 13 (4th Cir. 2011); *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010).  "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon*, 535 U.S. at 645 (internal quotation marks omitted).

Aurel does not request prospective or declaratory relief.  Therefore, this exception does not apply.

(a) Applicability of administrative remedies
No action shall be brought with respect to prison conditions under section 1983 of
this title, or any other Federal law, by a prisoner confined in any jail, prison, or
other correctional facility until such administrative remedies as are available are
exhausted.

42 U.S.C. § 1997e.

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or

detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent

for, violations of criminal law or the terms and conditions of parole, probation, pretrial release,

or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses

"all inmate suits about prison life, whether they involve general circumstances or particular

episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534

U.S. 516, 532 (2002).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement

and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to

exhaust administrative remedies is an affirmative defense to be pleaded and proven by

defendants. *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Anderson v. XYZ Correctional

Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

The PLRA's exhaustion requirement is designed so that prisoners pursue administrative

grievances until they receive a final denial of the claims, appealing through all available stages in

the administrative process. *Chase v. Peay*, 286 F.Supp.2d 523, 530 (D. Md. 2003), *aff'd* 98 Fed.

Appx. 253 (4th Cir,. 2004); *Gibbs v. Bureau of Prisons*, 986 F.Supp. 941, 943-44 (D. Md. 1997)

(dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his

administrative claim through all four stages of the BOP's grievance process); *Booth v. Churner*,

532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he

"never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette,* 517 F.3d 717, 725, 729 (4th Cir. 2008); *see Langford v. Couch,* 50 F.Supp.2d 544, 548 (E.D. Va. 1999) ("[T]he PLRA amendment made clear that exhaustion is now mandatory."). The exceptions discussed in *Blake v. Ross*, 987 F.3d 693 (4th Cir. 2015), do not apply here.

Nevertheless, administrative must be available to the inmate, and this court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aguilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). The Fourth Circuit has addressed the meaning of "available" remedies in *Moore,* 517 F. 3d at 725:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See Aguilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id*. at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

*See also Blake v. Ross*, *supra*, 987 F.3d at 698-701.

The Maryland Department of Public Safety and Correctional Services has made an

"administrative remedy procedure" ("ARP") available to Maryland State prisoners, within the meaning of 42 U.S.C. § 1997e(a), for the submission of "grievance[s] against . . . official[s] or employee[s] of the Division of Correction." C.S. § 10-206(a); *see generally* C.S. §§ 10-201 *et seq.*; Code of Maryland Regulations ("COMAR") 12.07.01.01(B)(1) (defining ARP). Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance' to include a "complaint of any individual in the custody of the [DOC] . . . against any officials or employees of the [DOC] . . . arising from the circumstances of custody or confinement." COMAR 12.07.01.01B(8).[7]

An inmate "must exhaust" the ARP process as a condition precedent to further review of the inmate's grievance. *See* C.S. § 10-206(b); *see also* COMAR 12.07.01.02.D; DCD 185-002 (effective August 27, 2008). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006).

---

[7] Maryland appellate case law indicates that the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC inmate.'" *Massey v. Galley*, 392 Md. 634, 646, 898 A.2d 951, 958 (2006) (citation omitted). Rather, it applies only to matters that "relate to or involve a prisoner's 'conditions of confinement.'" *Id.* at 651, 898 A.2d at 960 (citation omitted). Thus, the grievance procedure does not apply to requests for public information under the Maryland Public Information Act, *see id.*, nor does it apply to medical malpractice claims against private medical service providers who treat inmates under contract with the DOC. *See Abramson v. Correctional Med. Servs., Inc.*, 359 Md. 238, 753 A.2d 501 (2000).

Moreover, the administrative grievance procedure does not apply to claims for compensation for disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," C.S. § 10-304, for which a claim to a different administrative body, the Sundry Claims Board, is the exclusive remedy. *See Dixon v. DPSCS*, 175 Md. App. 384, 927 A.2d 445 (2007). On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims, such as tort claims of assault and battery against prison officers. *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).

In Maryland, filing a request for administrative remedy with the warden of the prison is the first of three steps in the ARP process. *See* COMAR 12.07.01.04. The ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the inmate first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.07.01.05A.  If the request is denied, a prisoner has 30 calendar days to file an appeal with the Commissioner of Correction. COMAR 12.07.01.05C; *Blake v. Ross*, 787 F.3d at 697.   If the appeal is denied, the prisoner has 30 days to file a grievance with the Inmate Grievance Office ("IGO"). *See* C.S. §§ 10-206, 10-210; COMAR 12 07.01.03; COMAR 12.07.01.05B.

Complaints are reviewed preliminarily by the IGO.  *See* C.S. § 10-207; COMAR 12.07.01.06A. If the complaint is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1); *see* COMAR 12.07.01.07B. The order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* C.J. § 10-208(c); COMAR 12.07.01.07-.08. The conduct of such hearings is governed by statute. C.S. § 10-208.

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination. However, a decision concluding that the inmate's complaint is wholly or partly meritorious constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. *See* C.S. § 10-209(b)-(c).

The final agency determination is subject to judicial review in Maryland State court, so

20

long as the claimant has exhausted his/her remedies.  *See* C.S. § 10-210.  But, an inmate need not seek judicial review in State court in order to satisfy the PLRA's administrative exhaustion requirement.  *See, e.g., Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir.) ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court."), *cert. denied*, 537 U.S. 949 (2002).[8]

Aurel's access to the grievance process is undisputed and evident from the records.  It is also evident that he failed to exhaust his administrative remedies prior to filing his lawsuit in this court.   In particular, although Aurel filed numerous ARPs (ECF 11-3 at 2-6), defendant submitted evidence that establishes that Aurel failed to exhaust his administrative remedies to the IGO regarding his housing unit ventilation claim.   Aurel offers no opposition materials showing that he exhausted his remedies or was otherwise estopped from pursuing a grievance with the IGO.

**5.**

Alternatively, even assuming, *arguendo*, that Aurel properly exhausted his administrative remedies, summary judgment in favor of defendant is appropriate because the pleadings, declarations, and exhibits on file demonstrate that defendant did not violate Aurel's Eighth Amendment rights.

The undisputed record shows that the ventilation system at NBCI was working properly and was designed to provide each cell with ventilation to keep cell temperatures within a normal range.  Twigg affirms that the system is tested every four months to ensure the system is suitably working  and a computerized system that routinely monitors ventilation has shown there were no

---

[8]  But *see* Md. Code, Cts. & Jud. Proc. Art. § 5-1003(a)(3) of Courts and Judicial Proceedings Article ("Judicial review following administrative consideration shall be the exclusive judicial remedy for any grievance or complaint within the scope of the administrative process . . . .").

significant ventilation issues.  Further, the uncontested medical record provided to the court illustrates that Aurel suffered no real injury related to the alleged lack of adequate ventilation.

Aurel's claim also fails because he cannot demonstrate that Twigg acted with deliberate or callous indifference by allowing a specific known risk of harm to occur.  Indeed, aside from noting that Twigg is the Maintenance Supervisor at NBCI, Aurel makes no specific claims as to how Twigg was personally involved in his Eighth Amendment claim.

An Eighth Amendment violation cannot be made given the facts of this case.  Summary judgment will be entered in favor of defendant in a separate Order to follow.


Date: December 10, 2015                    _____/s/_____
                                          Ellen L. Hollander
                                          United States District Judge